HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| TRITON TECH OF TEXAS, LLC, | NO. C13-157RAJ |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| NINTENDO OF AMERICA, INC., | |
| Defendant. | |

## I.  INTRODUCTION

This matter comes before the court on the parties' request that the court construe disputed terms in United States Patent No. 5,181,181 (the "'181 Patent" or the "Patent"). The court has reviewed the parties' briefs and supporting materials. The court has previously advised the parties that neither oral argument nor an evidentiary hearing is necessary to construe the disputed terms.

## II.  BACKGROUND

The '181 Patent, which issued in 1993, covers a device that sends three-dimensional data to a computer. The preferred embodiment of the invention is a three-dimensional version of the ubiquitous computer "mouse." Whereas a conventional mouse communicates positional information in only two dimensions (typically along the plane defined by the computer user's desk, table, or other operating surface), the preferred embodiment of the '181 Patent is a mouse that communicates positional information in three dimensions.

ORDER – 1

Plaintiff Triton Tech of Texas, LLC ("Triton Tech") holds the rights to the '181 Patent.[1]  It contends that Defendant Nintendo of America Inc. ("Nintendo") infringes the Patent with controllers for its home video game systems.  The court need not consider the infringement dispute in this order, which concerns only the interpretation of certain terms in the '181 Patent.

The Patent contains 21 claims, four of which (claims 1, 4, 19, and 20) are independent.  Triton Tech asserts only claims 4, 5, 13-15, and 19 against Nintendo.  The asserted independent claims are lengthy and the court declines to recite them here.  The court offers a summary, however, solely for the purpose of placing the disputed claim terms in context.

Claims 4 and 19, broadly speaking, require an input device (for providing information to a computer) that collects data along with a means for converting that data to useful information about the device's three-dimensional position.  The input device itself consists of three "acceleration sensors" that measure linear acceleration along three mutually perpendicular axes.  These sensors output signals that can be converted into information about the position of the device in three-dimensional space and the three dimensional velocity (*i.e.*, speed plus direction) of the device.  These data, however, are insufficient to fully describe three-dimensional movement.  Position and velocity only tell part of the story: the attitude of a moving object matters as well.  As an illustration, the court notes that a pilot may be less interested in the velocity of a plane and its location above the earth than in whether the plane is flying upside down.  To convey attitudinal information, claims 4 and 19 also require three "rotational rate sensors" that measure the rate at which the device rotates about each of the three mutually perpendicular axes.  Signals from those sensors can be converted into information about the device's attitude

---

[1] The '181 Patent lists Triton Technologies, Inc., as its assignee.  Although the court is aware of no evidence establishing Triton Tech's right to enforce the patent-in-suit, no one disputes it for purposes of claim construction.

ORDER – 2

and changes in attitude. The conversion of both the linear acceleration and rotational rate information is accomplished via an analog-to-digital converter, which feeds digital information into a buffer memory, along with an "integrator means," which translates linear acceleration data into velocity or position data and which translates rotational rate data into attitude data. Finally, the invention requires a "communication means" for transmitting data between the input device and the computing device.[2]

The court summarizes the claim terms that the parties dispute before analyzing and resolving those disputes:

1) Independent claims 4 and 19 disclose in their preambles an "input device for providing information to a computing device . . . ." The parties dispute what "input device" means.

2) The disputed independent claims further disclose "communication means" and "integrator means" that are "associated with said input device . . . ." The parties dispute whether the limitation "associated with said input device" demands that the specified means be located somewhere other than the computing device to which the claimed input device provides information.

3) As the court has already noted, the disputed independent claims require three "acceleration sensors" and three "rotational rate sensors" within the claimed input device. The disputed independent claims themselves contain a description of the properties of these six sensors, and Nintendo believes that description suffices. Triton Tech believes otherwise.

---

[2] With a minor exception, which the court discusses in Part III.B, *infra*, differences between claim 4 and claim 19 are immaterial to the parties' claim construction disputes. Briefly, claim 4 explicitly requires "analog" electrical signals from the linear acceleration sensors, and requires no specific output from the rotational rate sensors. The analog-to-digital converter, buffer memory, and integrator means process only data from the linear acceleration sensors and produce only positional data. In claim 19, by contrast, the linear acceleration signals are not explicitly "analog," the rotational rate sensors produce "analog signals having values proportional to the detected rate of rotation," and the analog-to-digital converter, buffer memory, and integrator means combine to produce data on both position and attitude.

ORDER – 3

4) Finally, the parties raise several related disputes over the "integrator means," (which appears in claim 5 along with the disputed independent claims), the "communication means" (which appears in the disputed independent claims), and the "processing means" of claim 13 (which is a means for "compensating for acceleration detected by [the] acceleration sensors attributable to gravit[y]." The parties agree that each of these claim elements is in the means-plus-function format proscribed at 35 U.S.C. § 112(f). They disagree, however, as to what "structure, material, or acts" correspond to the claimed means.

The court now considers both the law governing claim construction and the application of that law to the parties' disputes.

### III.  ANALYSIS

The court begins by reciting basic claim construction principles. The specification of a patent begins with a written description, which often includes drawings or illustrations, and "conclude[s] with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). The claims reign supreme over the remainder of a patent; they alone "define the scope of patent protection." *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) ("[A] patent applicant defines his invention in the claims, not in the [remainder of] the specification."); *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257-58 (Fed. Cir. 1989) ("A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention.").

The court alone determines what patent claims mean. In *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996), the Supreme Court held that claim construction "is exclusively within the province of the court." In *Markman*'s wake, the Federal Circuit has clarified that claim construction is a "pure issue of law," despite any

ORDER – 4

"factual underpinnings" or "allegedly fact-based questions relating to claim construction." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455-56 (Fed. Cir. 1998) (holding that de novo review applies to all claim construction issues).

Whereas the claims alone define the scope of the invention, construing the claims requires the court to start with the language of the claims, but also to look elsewhere. The Federal Circuit's en banc decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), provides comprehensive instructions for navigating evidence relevant to claim construction. The court begins with the language of the claims themselves, which "provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314; *Amgen Inc. v. Hoechst Marion Roussell, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006) (citing *Phillips* for the proposition that "claim construction must begin with the words of the claims themselves"). The court should "generally give[] [claim terms] their ordinary and customary meaning" in the eyes of a person of ordinary skill in the art as of the filing date of the patent. *Phillips*, 415 F.3d at 1312-13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed Cir. 1996)). In some cases, the ordinary meaning "may be readily apparent even to lay judges," in which case the claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

Beyond the claim language, the remainder of the specification is "always highly relevant to the claim construction analysis." *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). The specification is dispositive when the inventor uses it to explicitly define a claim term, in which case "the inventor's lexicography governs." *Id.* at 1316. But even where the specification does not explicitly define a term, it may do so implicitly, *id.* at 1321, and in any event is a "concordance for the claims," *id.* at 1315 (citation omitted), on which the court should "rely heavily." *Id.* at 1317. At the same time, a court must toe a fine line "between using the specification to interpret the meaning of a claim and

ORDER – 5

importing limitations from the specification into the claim." *Id.* at 1323; *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001) (describing "reading a limitation from the written description into the claims" as "one of the cardinal sins of patent law").

The final source of "intrinsic evidence" bearing on claim interpretation is the patent's prosecution history. *Phillips*, 415 F.3d at 1317. The prosecution history begins with the inventor's application to the United States Patent and Trademark Office ("PTO"), and includes all communication between the inventor and the PTO, culminating in the PTO's decision to issue the patent. *Vitronics*, 90 F.3d at 1582. An inventor must often disclaim part of the scope of an invention during prosecution to obtain a patent. Where the prosecution history reflects a "clear and unmistakable disavowal of scope," a court must construe the claims accordingly. *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). The court must recognize, however, that "the prosecution history represents an ongoing negotiation between the PTO and the applicant," and thus "often lacks the clarity of the specification." *Phillips*, 415 F.3d at 1317. It is nonetheless useful for claim construction, although less so than the specification. *Id.*

Extrinsic evidence is always "less significant" and in general "less reliable" than intrinsic evidence. *Id.* at 1318. Unlike intrinsic evidence, extrinsic evidence is not "created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning." *Id.* Expert evidence, in particular, is "generated at time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* The court has discretion to use extrinsic evidence in claim construction, but need not do so. *Id.* at 1319. Indeed, where the intrinsic evidence is adequate to define a claim term, "it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583; *Trilogy Communs., Inc. v. Times Fiber Communs., Inc.*, 109 F.3d 739, 744 (Fed.

ORDER – 6

Cir. 1997) ("When . . . district court has concluded that the patent specification and prosecution history adequately elucidate the proper meaning of claims, expert testimony is not necessary and certainly not crucial.").

With these basic interpretative principles in mind, the court turns to the disputed claim terms of the '181 Patent.

**A.     The "Input Device" Need Not Be "Responsive to Human Manipulation."**

The parties agree that the "input device" disclosed in the preambles to claims 4 and 19 is an "apparatus for providing information to a computing device." Their disagreement is that Triton Tech believes that the input device must also be "responsive to human manipulation." That limitation appears nowhere in the claims.

The preferred embodiment of the invention is a handheld mouse. But embodiments, even preferred embodiments, do not limit claims. *Phillips*, 415 F.3d at 1323; *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007) (rejecting "an attempt to import a feature from a preferred embodiment into the claims"). As Triton Tech points out, the Patent discloses no embodiments that are not "responsive to human manipulation." In addition to the mouse of the preferred embodiment, it discloses that "other variations are possible," including a device "mounted on a helmet to detect head movements" and "foot and/or leg-mounted" devices. 11:44-49.[3] But the Patent discloses those possibilities without limitation, noting that "[o]ther arrangements will also be apparent to the skilled practitioner." 11:50-51. The court is not a skilled practitioner, but the patent discloses no prohibition on an input device attached to, for example, a pet or a weather vane. The Patent does not limit the "input device" to those that are "responsive to human manipulation."

---

[3] Except when citing claims or figures, the court uses column and line numbers to cite the patent-in-suit. The citation "'2:46-49," for example, refers to lines 46-49 of column 2 of the '181 Patent.

ORDER – 7

The court construes "input device" to mean "an apparatus for providing information to a computing device."

**B.    The Phrase "Associated with [the Claimed] Input Device" Does Not Limit the Location of the Associated Component.**

Claims 4 and 19 both require "integrator means" and "communication means" that are "associated with [the claimed] input device."  Claim 4 also requires an "analog-to-digital converter" that is "associated with said input device . . . ."  The parties agree that the latter phrase means "located within the input device or an ancillary components area."  Their dispute is that Nintendo believes that the ancillary components area must be "external to the computing device," whereas Triton Tech does not.

The court generally prefers not to disturb the parties' agreed-upon constructions, but in this case, they both misinterpret the phrase "associated with [the claimed] input device" to limit the *location* of the associated integrator means, communication means, or analog-to-digital converter.  The Patent's inventor had no difficulty expressing claim limitations that require a specific location of components.  For example, claims 4 and 19 both require a "housing" and require the acceleration sensors and rotational rate sensors to be "in said housing . . . ."  By contrast, the integrator means, communication means, processing means, and analog-to-digital converter need merely be "associated with" the input device.

The specification dispels any interpretation that turns "associated with" into a location limitation.  It describes a "motion sensing assembly" consisting of the six sensors (6:3-12) along with an "ancillary components area" that may contain a sensor interface, analog-to-digital converter, and processing element, among other components.  *See* 6:37-40 ("Sensor signals from the individual components of the motion sensing assembly . . . are provided to circuits in the ancillary components area . . . which performs processing of the sensor signals.").  The integrator means, processing means, and analog-to-digital converter are all components located in the ancillary components

ORDER – 8

1  area.  The specification explicitly declines to limit the location of the ancillary
2  components area.  In the preferred embodiment, it is located within the mouse.  5:62-65;
3  Figs 1(a)-(c), 2(a)-(c).  But "components included in the ancillary components area . . .
4  may be contained within a separate chassis remote from the mouse . . . ."  5:66-68.
5  Nothing in the specification excludes any location for the ancillary components.

6        Nintendo attempts to prop up its interpretation with the prosecution history, which
7  reveals that the inventor added the "associated with" limitations in response to a PTO
8  action which rejected all of the claims as indefinite.  Hamilton Decl. (Dkt. 118-1), Ex. 2,
9  ¶ 6.  Among the PTO examiner's criticisms were that he could not distinguish how the
10 claimed integrator means, communication means, and processing means were
11 interconnected with other portions of the device.  *Id.* ¶¶ 6-9, 12.  He asked several
12 questions about the location of various subcomponents.  *Id.*  When the inventor
13 responded, he did so with claims that included (for the first time) elements describing the
14 location of the sensors and including the "associated with the input device" limitations
15 that are at issue.  *Id.*, Ex. 3, at 2-6.  In explaining the amendments, however, the inventor
16 pointed out that whereas he was limiting the location of the sensors, he was generally *not*
17 limiting the location of the integrator means, communication means, or processing
18 means.  He pointed out the location of communication means in the preferred and
19 alternate embodiments, but explained that the claims were "not intended to be limited to
20 either specific embodiment," and that the amended claim "properly interconnects the
21 communication means with the remaining structure without unduly limiting the scope of
22 the claim."  *Id.* at 9-10.  He pointed out that the integrator means was separate from the
23 acceleration sensors, but otherwise declined to limit the location of that means.  *Id.* at 10.
24 As to the analog-to-digital converter, he similarly declined to limit its location.  *Id.*
25 Nintendo contends that the prosecution history favors its interpretation of "associated
26 with said input device," but the court disagrees.  Instead, the prosecution history shows

ORDER – 9

the inventor refusing to limit the location of the components at issue, instead merely requiring that they be "associated with the input device."

Whereas the phrase "associated with" does not limit location, the court cannot construe it to be meaningless. The inventor did not append the phrase to every component in claims 4 and 19 (for example, the claimed "buffer memory" is not explicitly "associated with" anything), which strongly suggests he intended it to mean something. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *cf. Power Mosfet Techs., L.L.C. v. Seimens AG*, 378 F.3d 1396, 1409-10 (Fed. Cir. 2004) (noting that constructions that render a term superfluous are "disfavored," but permissible where the specification demands). Here, the inventor chose to make some components "associated with the input device," which in the court's view merely excludes implementations that are not associated with the input device. For example, if the computer with which the input device communicates had software that was capable of converting linear acceleration and rotational rate information (from any source) into positional and attitudinal data, but that software was not associated with the input device, it would not be within the scope of the Patent. On the other hand, if the input device came with software to be loaded onto a computer, and the software was designed to convert data from the input device, then it would be within the scope of the Patent. Indeed, the specification discloses that the processes necessary to convert the sensor signals to usable positional and attitudinal data are "preferably implemented in hardware," but that practitioners would recognize that "software implementations of some processes [are] also possible." 8:52-56.[4]

---

[4] The disclosure of software-implemented integration means is a further reason to doubt Nintendo's preferred construction. If the inventor meant to permit software implementations while prohibiting them from residing on a particular computer, the court expects that he would have said so.

ORDER – 10

For these reasons, the court construes the phrase "associated with [the claimed] input device" to mean "having an association with the input device, as opposed to merely an association with the computing device (or other device)." The phrase does not limit the location of the component with which it is associated.

**C.    The Claims Themselves Suffice to Define the Claimed Acceleration Sensors and Rotational Rate Sensors.**

Claims 4 and 19 not only require three linear acceleration sensors and three rotational rate sensors, they specify their interconnected functions. For example, claim 19 requires as follows:

> a third acceleration sensor provided in said housing and oriented perpendicular to said first and second acceleration sensors for detecting acceleration along a third axis perpendicular to said first and second axes and producing electrical signals having values proportional to the detected acceleration

It also requires the following:

> a third rotational rate sensor provided in said housing for directly detecting rotation about said third axis and producing analog signals having values proportional to the detected rate of rotation

It discloses similar requirements for first and second acceleration sensors and rotational rate sensors, thus describing not only a group of six functional components, but requiring that they be positioned in a particular manner with respect to each other. A person unfamiliar with the jargon of three-dimensional geometry or physics might prefer a different explanation of these requirements (perhaps one with diagrams or animation), but the court discerns no other reason to depart from the plain language of the claims. Nintendo agrees.

Triton Tech, by contrast, prefers the following interpretation: "an electrical structure that detects and measures the linear [or rotational] acceleration upon the electrical structure." That interpretation will not suffice, as it wholly ignores the requirement of three separate sensors oriented in a particular way with respect to each other. It also will not suffice with respect to the rotational rate sensors because it is

ORDER – 11

functionally inaccurate. The claimed sensors measure "rotational rate" (*i.e.*, the number of rotations per unit of time), not rotational acceleration (*i.e.*, the change in the rotational rate per unit of time).

The only justification Triton Tech offers for its preferred construction is that "modern acceleration sensors are often composed of a single chip that provides multiple outputs relating to the different axes' linear acceleration." Pltf.'s Br. (Dkt. 115) at 9. The court cannot comment on the properties of modern acceleration sensors, but if they are not comprised of three sensors measuring acceleration along three mutually perpendicular axes, they are not the acceleration sensors claimed in the '181 Patent.

The court provides no construction for the acceleration sensors and rotational rate sensors of the '181 Patent beyond that disclosed in claims 4 and 19. If it were necessary, the court would consider a less jargon-dependent version for the purpose of instructing the jury. The court rejects Triton Tech's preferred construction because it finds no support in the specification, no support in the law, and is inaccurate as to the function of the rotational rate sensors.

**D.    Two of the Three Disputed Means-Plus-Function Terms Are Indefinite.**

The parties' remaining disputes center around claim elements that are phrased in means-plus-function format. The Patent Act permits a patentee to claim an element of an invention merely by describing its function in a claim. 35 U.S.C. § 112(f). But in order to gain the advantage of pure functional claiming, a patentee must disclose in the specification a structure, material, or act that fulfills the claimed function. *Id.*; *see also Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) ("The duty of a patentee to clearly link or associate structure with the claimed function is the *quid pro quo* for allowing the patentee to express the claim in terms of function under section 112 . . . ."). A means-plus-function claim that lacks a corresponding structure in the specification is indefinite, and thus invalid. *Biomedino*,

ORDER – 12

*LLC v. Waters Techs. Corp.*, 490 F.3d 946, 949 (Fed. Cir. 2007) (noting that determination of indefiniteness is a legal conclusion in the same way that the court's interpretation of a claim's meaning is a legal conclusion).

Once a court has identified a means-plus-function claim term, it must clarify what function the term recites, and then must hunt in the specification for structure that fulfills the stated function. *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). A means-plus-function claim encompasses "all structure in the specification corresponding to that element and equivalent structures." *Id.*

Nintendo and Triton Tech agree that claims 4 and 19 contain three means-plus-function elements. One is the "communication means" that is the final element of each claim. Another is the "integrator means" that precedes the "communication means" in both claims. The "integrator means" also appears, with additional functional requirements, in claim 5. The third is the "processor means" of claim 13.

### 1. Communication Means

The claims plainly disclose the function of the claimed "communication means." It serves to "communicat[e] information between [the claimed] input device and [the] computing device." No party argues that this functional description is unclear.

The parties also agree that the specification discloses structure corresponding to the claimed "communication means." The specification discloses six interface ports, one of which appears on each of the six surfaces of the claimed input device. 5:6-23; Figs. 1(a)-(d). The specification also discloses an alternative communication means – an "interface cable." 5:23-25; Fig. 1(d).

The only dispute is that Triton Tech believes that the claim covers not merely the six-interface-port configuration that the specification discloses, but more generically a "uni-directional or bi-directional wireless interface." To support that contention, Triton Tech points to the specification's disclosure of a "wireless interface" that is "[p]referably

ORDER – 13

. . . bi-directional." 4:8-17. That disclosure, however, does not disclose a structure, it merely discloses an alternate phrasing of the claimed function. That much is demonstrated in the remainder of the specification. The only "wireless interface" to which the specification points is illustrated in figure 3, which purports to illustrate "major functional elements" of the claimed invention. 6:33-35. Whereas the figure does illustrate, in block-diagram format, several physical components of the invention, the wireless interface is not among them. Instead, the "wireless interface" is illustrated with a schematic lightning bolt between the transceiver of the invention (comprised of the six interface ports) and the transceiver of the computer. Fig. 3. A lightning bolt is not a stand-in for structure, it is a pictorial representation of a function – communicating wirelessly. The only structure identified for performing that function is the six interface ports. 6: 35-36 (referring to figure 3 and designating "wireless interface" as the "mouse transceivers" that correspond to the six interface ports).

The court thus construes the "communication means" as the six interface ports, or a single cable, or their equivalents.

### 2. Integrator Means

The "integrator means" performs the function of "integrating [various signals] over time to produce [other signals]." The signals to be integrated and the resulting signals vary between claim 4 and claim 19, but no one disputes that the claims adequately disclose the function of the integrator means. Claim 5 elaborates on claim 4 by requiring that the integrator means "numerically integrate[]" the "digital acceleration sensor values."

The specification points to structure for performing integration: a "conventional microprocessor having a suitably programmed read-only memory" or a "suitably programmed conventional digital signal processor." 7:15-19. Triton Tech believes that

ORDER – 14

disclosure suffices.  Nintendo believes that the disclosure is inadequate as a matter of law to satisfy the requirements of a means-plus-function claim.

Nintendo relies largely on *Aristocrat Techs. Austr. Pty Ltd. v. Int'l Gaming Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008), in which the court extended precedent that requires an inventor claiming a computer-implemented aspect of his invention in means-plus-function format to do more than "simply [point to] a general purpose computer or microprocessor."  In *Aristocrat*, the inventor claimed a video slot machine that included a "control means" to accomplish various game functions.  *Id.* at 1330.  The specification disclosed only a "standard microprocessor" with "appropriate programming" to accomplish those functions.  *Id.* at 1333.  The court explained that without a disclosure of an algorithm that the microprocessor would carry out to accomplish the disclosed function, the specification did not limit the claim, and the claim amounted to "pure functional claiming."  *Id.*; *see also id.* at 1334 ("The reference to 'appropriate programming' imposes no limitation whatever, as any general purpose computer must be programmed.").

Triton Tech does not address *Aristocrat*.  Indeed, with the exception of a single district court case, it cites no law at all in support of its assertion that the Patent's specification adequately discloses a structure corresponding to the integrator means.  Instead, it insists that a person of ordinary skill in the art would know how to "suitably program" a microprocessor to accomplish the functions of the integrator means.  The argument it makes is one that the *Aristocrat* court squarely rejected.  The court explained that whether a person of ordinary skill in the art could practice the invention based on the specification's disclosures was a question of enablement rather than a question of indefiniteness.  *Aristocrat*, 521 F.3d at 1336 (noting that the inventor's argument "conflates the requirement of enablement under [35 U.S.C. § 112(a)] and the requirement to disclose the structure that performs the claimed function under [35 U.S.C. § 112(f)]").

ORDER – 15

In other words, even if a patent is properly enabled, it must still satisfy the "*quid pro quo*" of the mean-plus-function format.

*Aristocrat* controls the outcome of this dispute. Like the inventor in that case, Triton Tech can point only to a "suitably programmed" microprocessor. It discloses no algorithm to program into that microprocessor to perform the functions of the integrator means. At both claim 5 and in numerous places in the specification, the patent discloses "numerical integration" as a method of accomplishing those functions. "Numerical integration," however, is not a single algorithm, but rather a whole class of algorithms that can be used to calculate definite integrals for various functions. Although a person of skill in the art might be able to choose an appropriate numerical integration algorithm and program it onto a microprocessor, the Patent discloses no algorithm at all. The court therefore concludes that the '181 Patent does not adequately disclose a structure corresponding to the claimed "integrator means."

### 3. Processing Means

The "processing means" of claim 13 serves the function of "compensating for acceleration detected by [the claimed] acceleration sensors attributable to gravitational acceleration forces." Again, no one disputes that the claim adequately defines the function of the processing means.

Again, however, Triton Tech points to the same "suitably programmed" processors to satisfy its disclosure obligations. For the reasons the court has just discussed, that disclosure is inadequate.

### IV. CONCLUSION

The court construes the disputed claims of the patents-in-suit as described above. Given the court's conclusion that the "integrator means" and "processing means" are indefinite, each of the asserted claims is indefinite. Ordinarily, the court would dismiss Triton Tech's patent infringement claims and enter judgment for Nintendo. No party,

ORDER – 16

however, has requested a particular disposition.  The court therefore orders that no later than June 20, 2013, the parties shall submit a joint statement regarding the disposition of this case.  The parties shall not use the joint statement as a forum for reconsidering the court's claim construction.

DATED this 4th day of June, 2013.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 17